Filed 6/28/13  P. v. Booker CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEQUINTE TERRELL BOOKER,<br><br>    Defendant and Appellant. | D061584<br><br><br>(Super. Ct. No. FSB052555) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Brian S. McCarville, Judge.  Affirmed as modified.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry J. Carlton and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Dequinte Terrell Booker of, among other things, the attempted murder of Albert Valdez.  In a prior appeal, we rejected his challenges to the jury's

verdicts, but found the trial court had erred by failing to conduct a postverdict hearing under *People v. Marsden* (1970) 2 Ca1.3d 118 (*Marsden*). (*People v. Booker* (Oct. 28, 2009, D054608 [nonpub. opn.], as modified Nov. 19, 2009; (the Prior Opinion).) On remand, the trial court granted Booker's *Marsden* motion, but denied his motion for new trial.

Booker appeals, contending that the trial court improperly denied his new trial motion based on (a) alleged error under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), (b) false testimony, and (c) ineffective assistance of counsel. He also contends that cumulative errors committed by the trial court, the prosecutor, and his trial counsel require reversal of the judgment. Finally, he claims the trial court committed a number of sentencing errors.

We reject Booker's contention that the trial court improperly denied his new trial motion. As we explain below, the trial court erred in resentencing Booker and we affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

We repeat most of the background facts from our prior opinion:

"At about 1:00 a.m. on February 2, 2005, Darlene Gasca and Albert Valdez, Jr. were walking down 9th Street in San Bernardino toward Gasca's home. The IE Projects, an African-American criminal street gang, claimed the area as part of their territory. Gasca and Valdez saw a group of Black men and heard someone yell: 'Who's that?' or 'Who are you?'

2

"Valdez described the person who spoke to them as a Black man in dark clothing. Valdez replied 'who are you,' turned and walked away, and then heard gunshots. Valdez hid behind a car, and then got shot in the leg and chest after he got up to knock on the door of a house. Gasca heard the gunshots, but did not see the shooter.

"An information charged Booker with attempted premeditated murder (count 1), two counts of being a felon in possession of a firearm (counts 2 and 3), possession of cocaine base (count 4), possession of a controlled substance with a firearm (count 5), participating in a criminal street gang (count 6) and possession of ammunition by a felon (count 7). Count 1 carried various firearm enhancements and counts 1-3 alleged that Booker committed the crimes for the benefit of a criminal street gang. The information also alleged that Booker had suffered a prior serious or violent felony conviction and a prior strike conviction.

"At trial, Valdez stated that he did not see the type of gun his assailant fired. He claimed that he did not see the shooter and could not identify Booker, but denied being afraid of identifying Booker. Valdez could not remember picking Booker out of a photographic lineup, but a police officer later testified that Valdez picked out Booker's photograph and claimed he was 'pretty sure' that the person in the photograph was the shooter. When the police officer asked Valdez to document his identification by initialing the photograph or circling the number, Valdez refused because he feared retaliation.

3

"Hope Webb, a paid FBI gang informant, lived near 9th Street in San Bernardino and allowed IE Projects gang members to use her home. Webb testified that she has known Booker for a long time, knew he was an IE Projects gang member and that he used the street name 'Mook.' Before the shooting, Webb was home with Booker and several other people. Webb saw Booker with a handgun and an assault rifle and watched him put bullets inside the gun while wearing gloves. Booker then left with several other people while carrying the assault rifle. Webb heard shooting coming from 9th Street and then saw Booker return to the house all hot and sweaty, like he had been running. Booker put the rifle in a shed outside Webb's home.

"Booker left Webb's house and returned the next afternoon to retrieve the rifle from the shed. At some point, Webb heard Booker say, 'did you see how he fell when I shot him?' About an hour after the shooting, Webb telephoned her FBI contact, Special Agent James Manzi, and told him in a hysterical voice that Booker had just shot someone near her house with a rifle. Special Agent Manzi considered Webb to be a very reliable informant." (Prior Opinion at pp. 2–4.)

The jury found Booker guilty of attempted premeditated murder (count 1), two counts of being a felon in possession of a firearm (counts 2 and 3), participating in a criminal street gang (count 6) and possession of ammunition by a felon (count 7). It also found true all the enhancement allegations. In the Prior Opinion, we rejected his challenges to the jury's verdicts, but found the trial court had erred by failing to conduct a postverdict *Marsden* hearing. (Prior Opinion at p. 22.) On remand, the trial court granted Booker's *Marsden* motion, but denied his motion for new trial on the

ground any withheld evidence would not have changed the outcome of the trial.

Booker again appealed.

DISCUSSION

I. *Denial of New Trial Motion*

A. General Legal Principles

We review "a trial court's ruling on a motion for new trial . . . under a deferential abuse of discretion standard.  [Citation.]"  (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27.)  "The appellant has the burden to demonstrate that the trial court's decision was 'irrational or arbitrary,' or that it was not '"grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." [Citation.]'"  (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659.)

B. Alleged *Brady* Error

1. General Legal Principles

"In *Brady*, the United States Supreme Court held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'  [Citation.]  Thus, under *Brady* and its progeny, the state is required to disclose to the defense any material, favorable evidence.  [Citations.]  Favorable evidence includes both evidence that is exculpatory to the defendant as well as evidence that is damaging to the prosecution, such as evidence that impeaches a government witness.  [Citations.]"  (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1471–1472.)  Materiality "requires more than a showing that the

5

suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation].  A defendant instead 'must show a "reasonable probability of a different result." '  [Citation.]"  (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042–1043 (*Salazar*).)

There are three elements to a *Brady* claim:  (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) defendant suffered prejudice.  (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)  "Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.]"  (*Ibid*.)  " 'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citations].  In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony," [citations].' [Citation.]"  (*Id.* at p. 1050.)  "Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim [citation], are subject to independent review.  [Citation.]  Because the [trier of fact] can observe the demeanor of the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight when supported by substantial evidence."  (*Id.* at p. 1042.)

6

2. Webb's Drug Cases

a. Facts

In May and August, 2004, Webb suffered two arrests for possession of cocaine and possessing cocaine base for sale (case numbers FSB045972, FSB045478). In August and October, 2004, she failed to appear in court and bench warrants were issued for her arrest. In October 2004, the FBI recruited Webb as a confidential informant.

In November 2004, police cited Webb for misdemeanor driving under the influence of drugs (case number TVA92359). She failed to appear at her December 2004 arraignment and a bench warrant was issued for her arrest. On February 2, 2005, Webb reported the shooting to Special Agent Manzi. Booker was arrested a few days later. About two weeks later, Webb was arrested on her outstanding warrants. Webb appeared in court the following day on all three cases.

Notes from the district attorney's files dated in February and March, 2005, reveal that the district attorney needed to "[c]heck out" Webb's "FBI story." In case number FSB045478, Webb was offered "PG 11351 180 (wkends ok)." The district attorney's files for case number FSB045972 included a case history sheet with four entries dated between February 28, 2005 and March 21, 2005 as follows: (1) "check out [defendant's] FBI/SBPD story," and "Rejects HS 11351/180"; (2) "FBI/SBPD story is bogus"; (3) "Judge Reily says [defendant] must do Inroads"; and (4) "[defendant] rejects: on record 11366/INROADS."

On March 28, 2005, Deputy District Attorney Annamarie Pace indicated that a plea agreement had been reached and that the plea was to count 1 and to driving under the influence, "120 OR/Cruz w/e Dism other fel + misd." On the lined piece of paper, Pace had written on May 2, 2005, "[defendant] FTA" and "[No] bail"; and on June 17, 2005, "Plea changed to 109," "CTS 73+36 = 109," "informal prob 3y," "Terms 1, 2, 10," and "This b/c [defendant] is a Fed snitch + her life is in danger. Also, feds have something on her to hang over head. [Defendant] to be relocated."

On March 28, 2005, Webb pleaded guilty in case number FSB045972. Under the terms of the plea bargain, the court granted the People's motion to dismiss count 1, ordered Webb to serve 109 days in jail, and placed her on three years' probation. On June 17, 2005, under the plea bargain in case number FSB045972, the court granted the People's motion to dismiss case number TVA92359. In August 2006, the FBI terminated Webb as an informant and she is relocated. In January 2007, Booker's trial began.

b. Analysis

Booker contends that the trial court erred in denying his new trial motion because court records and the prosecutor's files outlined above reveal that Webb received reduced charges or immunity from prosecution. He claims that Webb received a deal on her drug cases because she was a "snitch" and the "feds had something to hang over her head." Booker contends that this evidence and the evidence of the drug charges constituted impeachment evidence withheld by the prosecution that was different from the impeachment evidence presented at trial.

8

As we shall explain, we conclude Booker failed to show that the prosecution suppressed the evidence.

Before trial, the prosecutor revealed that Webb had a 2005 misdemeanor DUI conviction, that she was on probation for a minimum of three years and had possession cases in Texas in 2006. The court later obtained records in case number FSB045972 and informed counsel that in June 2005, Webb was placed on probation and that she was "charged with a felony and failed to appear on a few occasions, plead out somewhere, she got three years probation, violate no law, 109, credit for 109, search terms, and $110 to the victim restitution fund. Possible *Cruz* waiver violation. Plead guilty to a deuce."

This record confirms that defense counsel was on notice to examine Webb's criminal history. Simply put, there is no *Brady* claim of prosecutorial suppression of evidence "'when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence. . . .'" (*People v. Morrison* (2004) 34 Cal.4th 698, 715, quoting *United States v. Brown* (5th Cir. 1980) 628 F.2d 471, 473.)

3. Webb's Drug Use

a. Facts

Records from law enforcement agencies in Texas revealed that in March 2006, Webb was arrested for possession of a controlled substance. During her arrest, Webb claimed that she was an FBI informant and that she needed to "'be dirty'" for potential

9

cocaine buyers to believe she was "'legit.'" In October 2006, Webb was again arrested for possession of a controlled substance.

At the beginning of trial, the prosecutor disclosed that Webb had possession cases in Texas in 2006. Defense counsel later acknowledged that he had received paperwork showing two convictions in 2006 that were purportedly felonies, but were treated as misdemeanors under Texas law. Defense counsel, however, was unsure whether Webb was still on probation. The prosecutor indicated that she had provided a "faxed copy from the court in Texas regarding [Webb's] priors," and suggested an in camera hearing might be held. Although the court declined to hold an in camera hearing regarding whether Webb received a deal, defense counsel later spoke to Special Agent Manzi and learned that the FBI was not involved in brokering a deal with Webb for her problems in Texas. Defense counsel indicated that he was "willing to accept that representation as being a fact in the case." The prosecutor and defense counsel later spoke to the prosecuting attorney in the Texas cases who confirmed that Webb had two felony convictions, that her sole punishment was jail time, and that she had not received any special disposition. Defense counsel stated he verified "that in fact this was nothing special in the way of disposition; that in fact, based upon the circumstances and the quantity of drugs involved, that this was a pretty much standard outcome, at least as far as these two cases were concerned."

b. Analysis

Booker contends the prosecutor withheld information that Webb continued to use drugs in Texas in the months before his trial commenced. The People respond that

10

the prosecutor did not have a duty to search for and disclose Webb's criminal history in Texas because Texas law enforcement agencies were not involved in the prosecution or investigation of appellant's case. We agree with the People.

Under *Brady*, the prosecution is obligated to locate and turn over evidence that is "known to the others acting on the government's behalf in the case." (*Salazar*, *supra*, 35 Cal.4th at p. 1042.) Thus, the evidence must be "possessed by a person or agency that has been used by the prosecutor or the investigating agency to assist the prosecution or the investigating agency in its work." (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1315 (*Barrett*).) Here, the prosecutor satisfied her duty to disclose that Webb had possession cases in Texas in 2006. Moreover, the parties had the opportunity to investigate the Texas cases during trial and defense counsel was convinced that Webb received no special treatment. Because Booker made no showing that Texas law enforcement agencies were part of the prosecution team, the prosecutor did not have a duty to search for more information about Webb's Texas crimes. (*Barrett*, *supra*, 80 Cal.App.4th at p. 1315.)

4. Special Agent Manzi

a. Facts

At trial, Special Agent Manzi testified that Webb was an informant from October 2004 until August 2006, when the FBI closed her file and relocated Webb for her safety. During that period, Special Agent Manzi paid her about $17,000. Special Agent Manzi testified that he wrote reports about the information Webb provided on February 2 and 8, 2005, relating to this case, which were produced. After determining

11

that Webb provided credible information, he submitted paperwork to the FBI, received a check, gave cash to Webb and had her sign a receipt.

At the hearing on Booker's new trial motion, defense counsel explained that he had subpoenaed Special Agent Manzi to appear and produce certain records, but the United States Department of Justice objected, stating in a letter that counsel had not followed proper procedures. Defense counsel asked for a continuance, but alternatively stated that he was ready to go forward if the court was inclined to deny a continuance. Defense counsel explained that while Special Agent Manzi testified at trial, Special Agent Manzi was not asked whether he knew about Webb's drug cases and probation violation, that counsel wanted to prove that Special Agent Manzi violated federal guidelines regarding confidential informants, and wanted to obtain payment records to determine when Webb received her payments. The court granted the continuance and asked the prosecutor to "cooperate in endeavoring to make the FBI employee available."

At the continued hearing about four months later, the trial court heard testimony from Booker and Booker's trial counsel. Defense counsel also asked the court to admit into evidence the subpoena duces tecum he had served on Special Agent Manzi and a letter from the United States Department of Justice stating that the subpoena did not comply with federal regulations for obtaining the records. The trial court, however, sustained a relevancy objection, finding that counsel had plenty of time to comply with the requirements.

b. Analysis

Booker contends that Special Agent Manzi was part of the prosecution team and that the prosecution had an obligation to turn over impeachment evidence on Special Agent Manzi including information in Special Agent Manzi's files on Webb that would have shown that Special Agent Manzi had been less than candid at trial or Webb to be untruthful. As a threshold matter, the Attorney General did not address Booker's assertion that Special Agent Manzi was part of the prosecution team. However, we need not decide whether the FBI constituted part of the prosecution team acting on the behalf of the State of California, because even assuming so, Booker's claim fails because the evidence does not meet the materiality prong necessary to prove a *Brady* violation.

As we previously indicated, before trial began, the prosecutor revealed that Webb had a 2005 misdemeanor DUI conviction, that she was on probation for a minimum of three years and had possession cases in Texas in 2006. The court later obtained records in case number FSB045972 and informed defense counsel regarding Webb's failures to appear, plea, and probation. The prosecutor also spoke to the prosecuting attorney in the Texas cases, who confirmed that Webb had two felony convictions, that her sole punishment was jail time, and that she had not received any special disposition. Additionally, defense counsel spoke to Special Agent Manzi and learned that the FBI was not involved in brokering a deal with Webb for her problems in Texas. Thus, defense counsel was well aware of information to impeach Webb and

13

could have easily cross-examined Special Agent Manzi regarding *his knowledge* of this impeachment evidence.

Booker next asserts he presented credible allegations of misconduct by Special Agent Manzi and that the prosecution's failure to rebut his allegations "regarding [Special Agent] Manzi's misconduct constitutes a substantial basis for finding a *Brady* violation regarding [Special Agent] Manzi as a witness."  Stated differently, Booker asserts that the prosecution knew Special Agent Manzi committed misconduct and thus had a duty to disclose this information to the defense for the purpose of impeaching Special Agent Manzi.

We reviewed Booker's new trial motion to ascertain what evidence Booker claims the prosecution had regarding misconduct by Special Agent Manzi.  In his new trial motion, Booker never alleged that Special Agent Manzi had committed misconduct.  Rather, he claimed that Special Agent Manzi vouched for Webb but never testified about helping Webb stay out of jail on active warrants while he used her, the timing of Webb's payments, whether Webb was telling the truth when she said he never paid her rent and violations of federal guidelines for handling confidential informants.  Simply put, in his new trial motion, Booker never alleged or presented any evidence that Special Agent Manzi committed misconduct.  Accordingly, he did not show the existence of any of the three elements necessary for a *Brady* claim. (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)  (Although the new trial motion referenced declarations by attorneys Congdon and Jones, no such declarations were part of the new trial motion.  Attorneys Congdon and Jones filed declarations to support Booker's

14

"*Marsden*" motion. We have reviewed those declarations and find no evidence of misconduct by Special Agent Manzi.)

Booker suggests that Special Agent Manzi violated federal guidelines requiring that federal agents investigate the criminal history of a proposed informant. He contends his allegations were sufficient to require that the prosecution produce Special Agent Manzi and his files and, had this happened, the information obtained would have been favorable to his defense. Booker's argument is based entirely on supposition regarding the contents of Special Agent Manzi's files. Special Agent Manzi testified at trial and could have been asked about his files and knowledge of Webb's criminal history. Booker has not shown that anything in Special Agent Manzi's files was favorable to him or that these files were suppressed within the meaning of *Brady*.

Finally, Booker claims the prosecution continued to suppress Special Agent Manzi's testimony and files at the motion for new trial and this conduct constitutes a continuing *Brady* violation. Booker, however, did not raise this issue in his new trial motion and forfeited the claim. In any event, at the hearing of the new trial motion, the court sustained a relevancy objection to the admission of a subpoena requesting Special Agent Manzi's appearance and files, finding that counsel had plenty of time to comply with federal requirements. Booker has not shown that counsel complied with all federal requirements or that the government's failure to produce these records amounted to a *Brady* violation.

C.  Webb's Testimony

Booker alleges that Webb lied when she claimed that she had been sober for six months because she had been arrested in Texas for possessing crack within that period. He also claims that Webb lied when she stated that she worked as an informant to make money and to clean up her neighborhood.  He contends that even if the testimony did not amount to an explicit lie, the testimony was so misleading that it amounted to false evidence under *Brady* and *Napue v. Illinois* (1959) 360 U.S. 264 (*Napue*).  Namely, the prosecution's own files revealed that Webb received numerous benefits in criminal cases from the San Bernardino District Attorney's office.  Booker acknowledges that his counsel did not press for a ruling on his *Napue* claim at trial, but asserts he did not forfeit the claim because it is a federal constitutional claim based on undisputed facts and because counsel's failure to pursue the claim was prejudicially ineffective.

For purposes of analysis, we will assume, without deciding, that Booker did not forfeit this claim.  Nonetheless, we reject the claim on its merits.

The use of perjured testimony to obtain a conviction violates due process. (*Napue*, *supra*, 360 U.S. at p. 269; *People v. Marshall* (1996) 13 Cal.4th 799, 829–830.)  That principle applies even if the false testimony goes only to witness credibility since the "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence."  (*Napue*, *supra*, at p. 269.)  To prevail on a *Napue* claim, the defendant must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was

16

actually false, and (3) that the false testimony was material. (*United States v. Zuno-Arce* (9th Cir. 2003) 339 F.3d 886, 889.)

The fatal flaw in Booker's argument is his failure to show that Webb testified falsely; rather, he *surmises* that Webb testified falsely based on other information in the record. Webb testified at trial that she had been sober for six months and that she was still clean and sober. Her arrest in Texas for possession within that period undercuts her credibility, but does not show that she lied about her sobriety. Similarly, the drug charges pending against Webb during the time she acted as in informant undercuts her testimony that she worked as an informant to clean up her neighborhood, but does not show this testimony was false. Put differently, only Webb herself knows the true facts about her sobriety and whether part of her intent in working as an informant was to clean up her neighborhood. Attorneys "may ethically present evidence that they suspect, but do not personally know, is false." (*People v. Riel* (2000) 22 Cal.4th 1153, 1217.) Accordingly, there was no *Napue* violation.

Analyzing Booker's claim under *Brady*, he has not shown that Webb's alleged false testimony was suppressed because defense counsel *knew* about the evidence that Booker now claims allegedly contradicted Webb's trial testimony. The prosecutor disclosed when trial commenced that Webb had possession cases in Texas in 2006. Defense counsel later acknowledged that he received paperwork showing two convictions in 2006 that were purportedly felonies, but were treated as misdemeanors under Texas law. The prosecutor and defense counsel later spoke to the prosecuting attorney in the Texas cases, who confirmed that Webb had two felony convictions, that

17

her sole punishment was jail time, and that she had not received any special disposition. Defense counsel also knew about the drug charges pending against Webb during the time she acted as an informant as the prosecutor revealed Webb's 2005 misdemeanor DUI conviction and the trial court obtained records in Webb's 2004 possession of cocaine case and informed defense counsel about the outcome of the case.

D. Alleged Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a defendant bears the burden of showing that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and that absent counsel's error, it is reasonably probable that the verdict would have been more favorable. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052–1053.) "'If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation.'" (*Id.* at p. 1053.) "We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions" (*People v. Holt* (1997) 15 Cal.4th 619, 703) and will reverse on the ground of inadequate assistance of counsel only if the record affirmatively discloses that counsel had no rational tactical purpose for his act or omission (*People v. Zapien* (1993) 4 Cal.4th 929, 980). Generally, the failure to impeach a witness involves tactical decisions on counsel's part and seldom establishes a counsel's incompetence. (*People v. Frierson* (1979) 25 Cal.3d 142, 158.)

18

In his new trial motion, Booker asserted that his trial counsel was prejudicially ineffective for, among other things, failing to investigate Webb and impeach her at trial regarding local and Texas criminal charges against her and prior inconsistent statements she made about the shooting. He also pointed out that the prosecution used Special Agent Manzi to bolster Webb's credibility, but his trial counsel never asked Special Agent Manzi if he knew about Webb's criminal history.

At the hearing on the motion, the trial court heard testimony from Booker and Booker's prior trial counsel, and proposed defense witness Dewayne Riley. During argument on the motion, new defense counsel pointed out that because the victim could not identify Booker as the shooter, the case came down to Webb's testimony. He noted that Booker's trial counsel never cross-examined Webb about her criminal history, questioned Webb about her changed stories about the shooting and that the failure to present this impeachment evidence was prejudicial. The trial court found Booker's trial counsel was not ineffective because Webb was impeached at trial and the additional impeachment evidence would not have resulted in a different outcome.

1. Failure to Impeach Webb

Our discussion of the alleged *Brady* errors shows that defense counsel knew about potential impeachment evidence regarding Webb including her 2005 misdemeanor DUI conviction and the resolution of case number FSB045972 in June 2005, including Webb's failures to appear, plea, and probation. Defense counsel also knew of Webb's 2006 possession cases in Texas that were treated as misdemeanors

under Texas law. Our review of the record shows that defense counsel never attempted to impeach Webb with this criminal history.

Subject to the trial court's discretion under Evidence Code section 352, the California Constitution, article I, section 28, subdivision (f), "authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*People v. Castro* (1985) 38 Cal.3d 301, 306.) Possession of drugs for sale is a crime of moral turpitude (*People v. Harris* (2005) 37 Cal.4th 310, 337); however, simple possession of narcotics is not a crime of moral turpitude (*People v. Castro*, *supra*, 38 Cal.3d at p. 317).

Given Webb's criminal history, the sole felony conviction available for impeachment was her guilty plea in case number FSB045972 for possessing cocaine base for sale. At a minimum, this conviction undercut Webb's credibility because she testified that her desire to clean up her neighborhood partially motivated her to work as an informant. Nonetheless, defense counsel could have reasonably determined that impeaching Webb on this specific point was not critical given her testimony that she was a drug addict, her drug of choice was cocaine, in March of 2005 she was on probation and she was in jail after the events she testified to took place. (*People v. Frierson*, *supra*, 25 Cal.3d at p. 158 [failure to impeach a witness usually involves a tactical decision and seldom establishes a counsel's incompetence].) On this record,

20

we cannot say that defense counsel's failure to impeach Webb regarding her conviction for possessing cocaine for sale affected the verdict.

Booker also asserted that counsel was ineffective because he failed to question Webb regarding her changed stories about the shooting. Our review of the record does not support his assertion that Webb's recitation of the shooting changed over time.

Special Agent Manzi's notes, transcribed about a week after the shooting, state that Webb informed him that Booker "shot [a] Mexican Male." Specifically, she related how Booker went into her back bedroom to load a rifle, that he wiped fingerprints from the bullets and wore gloves. Booker left her home, she heard shots a few minutes later and then saw Booker return out of breath and sweating profusely. Booker put the rifle in the back bedroom and then moved it to a shed after Webb complained. Booker left and a few minutes later she "heard that Booker had just shot a Mexican male in the street." Booker later returned and removed the rifle. At trial, Webb similarly testified that she observed Booker in her back bedroom wearing gloves and loading a rifle with bullets that had been wiped clean. Booker left with the rifle, she heard shots, Booker came back to the home out of breath and sweating and she saw him put the rifle inside a shed after she refused to allow him to leave it inside the house.

Webb also testified that either after the shooting or when Booker retrieved the rifle, she heard Booker say, " 'D[id] you see how he fell when I shot him?' " While Webb apparently did not inform Special Agent Manzi of Booker's statement during her phone call to him after the shooting, she informed the prosecutor of this statement

21

during a pretrial interview. Accordingly, the failure of defense counsel to question Webb regarding her changed stories was not prejudicial because Webb's stories did not change.

2. Failure to Cross-Examine Special Agent Manzi

Booker also complains that the prosecution used Special Agent Manzi to bolster Webb's credibility, but defense counsel never asked Special Agent Manzi if he knew about Webb's criminal history. We believe defense counsel could have reasonably decided to not question Special Agent Manzi on this specific point because Webb testified that she was on probation in 2005 and in jail after the events she testified to took place. Special Agent Manzi also testified on direct that "most" informants have a criminal history, but this usually does not impact the ability to use the person as an informant. Moreover, had defense counsel specifically asked Special Agent Manzi about Webb's criminal history, he would have likely repeated what he said at the preliminary hearing, namely that he believed Webb had a history for possessing controlled substances, disorderly conduct and a couple DUI's, but he could not recall off the top of his head whether Webb had any felony convictions.

Defense counsel may well have concluded that asking Special Agent Manzi about Webb's criminal history added little value to the defense given the evidence already in the record on this topic and Special Agent Manzi's admission that most informants have a criminal history. Accordingly, we conclude that Booker failed to show that the omission was an unreasonable tactical choice that affected the verdict.

22

3. Failure to Interview Dewayne Riley

Booker claims defense counsel was ineffective because he failed to interview Dewayne Riley, an exculpatory witness who testified at the evidentiary hearing on the new trial motion that Booker was not present at Webb's house on the night of the shooting. First, Booker has not affirmatively shown that defense counsel failed to interview Riley. Rather, at the hearing on the new trial motion, defense counsel testified that he did not have a specific recollection whether Booker asked him to locate Riley, but claimed that if a specific name was mentioned that he would have requested that his investigator try to locate the person.

Even assuming defense counsel failed to have his investigator attempt to locate Riley, it is not reasonably probable that Riley's testimony would have resulted in a more favorable verdict. Riley testified that he was in Webb's living room when he heard the gunshots and that Booker was not inside Webb's house with him at the time of the shooting. If anything, this testimony supports Webb's testimony that Booker was the shooter. While Riley also claimed Booker was not at Webb's house on the day of the shooting or the days prior to and after the shooting, Riley was never asked if he was continuously at Webb's home those days. Accordingly, his statement that he did not see Booker those days had little value. Moreover, had Riley testified, it is likely the prosecutor would have elicited testimony that Riley was a former "Projects" gang member that was facing 255 years in prison for his recent convictions and that Riley denied Booker's membership in the "Projects" gang. Counsel could have reasonably determined that having Riley testify did not further Booker's defense.

23

## II. *Cumulative Error*

Booker argues his trial was rendered fundamentally unfair by cumulative error. Specifically, he contends the cumulative errors demonstrated by the motion for new trial, the declarations and exhibits filed in support of that motion, and the testimony presented at the evidentiary hearing show a reasonable likelihood he would have gotten a different result had jurors heard all the available impeachment on Webb and Special Agent Manzi.

As we detailed above, we have not found any prejudicial errors committed by the trial court, the prosecutor, or defense counsel. As Booker failed to persuade us that any error occurred, his cumulative error argument is meritless. (*People v. Heard* (2003) 31 Cal.4th 946, 982.)

## III. *Alleged Sentencing Errors*

In the prior appeal, we found two sentencing errors and issued directions on how to correct the errors. (Prior Opinion at p. 22.) We directed that if the new trial motion is filed and denied, then "the judgment and sentence previously imposed, as modified herein, shall be reinstated." (Prior Opinion at p. 23.) After the trial court denied Booker's new trial motion, it resentenced Booker on all counts. Booker appealed a number of sentencing issues. We requested supplemental briefing from the parties on whether the trial court exceeded the scope of our remand order by resentencing Booker on all counts. Assuming the trial court exceeded the scope of our remand order, the parties were asked to address how this impacted the various sentencing issues raised by both parties in this appeal.

24

The parties agree that the trial court exceeded the scope of our remand order by resentencing Booker. The People assert that the resentencing minute order and amended abstract of judgment contain a number of clerical errors that need to be corrected and improperly omitted a mandatory five-year term for Booker's prior serious felony conviction. Rather than correct these errors, we vacate the resentencing minute order dated January 20, 2012 and amended abstract of judgment filed March 15, 2012. This moots the sentencing issues raised by Booker on counts 3 and 6 and the issue raised by the People regarding the mandatory five-year term for Booker's prior serious felony conviction. The trial court is directed to reinstate the original sentence as to counts 3 and 6 and this enhancement.

When the trial court originally sentenced Booker, it erroneously failed to mention count 7. The parties agree that the proper sentence on count 7 is a consecutive term of one year, four months.

In the Prior Opinion on count 2, we directed the trial court to exercise its discretion under subdivision (b)(1)(A) of Penal Code section 186.22 to impose a two, three or four-year term on this enhancement. Accordingly, the trial court had jurisdiction to resentence Booker on this enhancement. In her supplemental report, the probation officer recommended that the trial court impose the four-year upper term for the gang enhancement. At resentencing, the trial court informed the parties that it had read and considered the probation report. The trial court imposed the middle term for the substantive charge on count two, but imposed the upper term for the gang enhancement. Booker, however, did not object.

25

Booker now claims the trial court erred by failing to give its reasons for sentencing him to the upper term on the gang enhancement as to count 2. The People assert Booker forfeited his claim by failing to object below and any error was harmless, as the probation officer found factors in aggravation, and none in mitigation. Assuming, without deciding, that the contention is not forfeited, we agree that the error was harmless.

The trial court is required to state on the record its reasons for selecting the upper term. (Pen. Code, § 1170, subd. (b).) "However, where the sentencing court fails to state such reasons, remand for resentencing is not automatic; we are to reverse the sentence only if 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.'" (*People v. Sanchez* (1994) 23 Cal.App.4th 1680, 1684.) Here, the trial court heard the testimony and considered the probation report. The probation officer noted no factors in mitigation, but a number of aggravating factors including prior convictions of increasing seriousness, unsatisfactory prior performance on probation and parole, a prior prison term, and the nature and circumstances of the crime. A single factor in aggravation is sufficient to justify an upper term on an enhancement. (*People v. Brown* (2000) 83 Cal.App.4th 1037, 1043.) On this record, we agree with the People, it is not reasonably probable that the trial court would have been unable to state adequate reasons to impose the upper term on the gang enhancement. Accordingly, we deny Booker's request to remand this issue to the trial court for a statement of reasons.

DISPOSITION

The resentencing minute order dated January 20, 2012 and amended abstract of judgment filed March 15, 2012 are vacated. The sentencing issues raised by Booker on counts 3 and 6 and the issue raised by the People regarding the mandatory five-year term for Booker's prior serious felony conviction are moot. The trial court is directed to reinstate the original sentence as to these counts and the enhancement.

On count 7, the trial court is directed to impose a consecutive term of one year, four months. In all other respects, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting the changes in the sentence set forth in the Prior Opinion and herein.

McINTYRE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

27